UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

MCGRIFF INSURANCE SERVICES,
INC., f/k/a BB&T Insurance
Services, Inc.,

       Plaintiff,

v.                              Case No:  2:21-cv-480-JES-NPM

EUGENE LITTLESTONE, CALEB
LITTLESTONE, DAWN DISCH,
DOUGLAS FIELDS, MICHAEL
FIELDS, and ALLIANT
INSURANCE SERVICES, INC.,

       Defendants.

_____

## OPINION AND ORDER

This matter comes before the Court on plaintiff's Motion for Temporary Restraining Order (Doc. #17) filed on July 12, 2021 and construed as a motion for preliminary injunction.  (Doc. #19.) Defendants Eugene Littlestone (E. Littlestone), Caleb Littlestone (C. Littlestone), Dawn Disch (Disch)[1], Douglas Fields (D. Fields), Michael Fields (M. Fields)[2] and Alliant Insurance Services, Inc.

_____

[1] Defendant Disch's Motion to Dismiss was granted to the extent that the Amended Complaint was dismissed without prejudice to filing a Second Amended Complaint.  (Doc. #51.)  A Second Motion to Dismiss Plaintiff's Claims Against Defendant Dawn Disch (Doc. #64) was filed on September 14, 2021.

[2] Defendant M. Fields' Motion to Sever and Transfer was denied on August 17, 2021.  (Doc. #52.)  A Motion for Partial Dismissal Pursuant to Rule 12(b)(6) (Doc. #65) was filed on September 14, 2021, by the Littlestones, the Fields, and Alliant.

(Alliant) filed a Response to Motion for Temporary Restraining Order/Preliminary Injunction (Doc. #27) on July 19, 2021. With leave of Court, plaintiff filed a Reply in Support (Doc. #37) and defendants filed a Sur-Reply in Opposition (Doc. #40).

**I.**

"The purpose of the preliminary injunction is to preserve the positions of the parties as best we can until a trial on the merits may be held." Bloedorn v. Grube, 631 F.3d 1218, 1229 (11th Cir. 2011) (citation omitted). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes 'the burden of persuasion' as to each of the four prerequisites." Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (quoting All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc., 887 F.2d 1535, 1537 (11th Cir. 1989)) (citations omitted).

"A preliminary injunction is appropriate if the movant demonstrates all of these elements: (1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest. Chavez v. Fla. SP Warden, 742 F.3d 1267, 1271 (11th Cir. 2014) (citing Parker v. State Bd. of Pardons & Paroles, 275 F.3d 1032, 1034-35 (11th Cir. 2001)).

**A. Substantial Likelihood of Success**

"The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." Amoco Prod. Co. v. Vill. of Gambell, AK, 480 U.S. 531, 546 n.12 (1987).

**1. Second Amended Complaint**

In the Second Amended Complaint, plaintiff describes the suit as a case for damages arising from the Defendants' blatant solicitation of employees and customers in violation of several employment agreements, breach of fiduciary duties owed to Plaintiff while employed, and theft of Plaintiff's trade secret information through which it provides insurance and benefits services to clients in Florida and elsewhere." (Doc. #53, ¶ 1.)

The alleges facts are as follows: In November 2009, E. Littlestone began his employment with McGriff, and he entered into an Employee Agreement on November 2, 2009. McGriff changed its name in 2018 to BB&T Insurance Services. During his 11-year tenure, E. Littlestone worked as an insurance agent. The Employment Agreement was amended on January 1, 2011 and January 8, 2018, but the confidentiality and non-solicitation provisions remained intact. (Id., ¶¶ 18-20.)

On April 21, 2008, Disch began her employment with Oswald, Trippe and Company, Inc. and on July 6, 2008, she executed an

Employment Agreement.  (Id., ¶ 23.)  On November 2, 2009, the company was acquired, via merger, by OTCI Acquisition, LLC, which merged into BB&T Insurance Services, Inc. on that same day. Disch's Employment Agreement also contained restrictive covenants. Both E. Littlestone and Disch started working with Alliant, a direct competitor.  (Id., ¶¶ 24-25, 27.)

Alliant also solicited C. Littlestone, the son of E. Littlestone.  The son does not have a written employment agreement with McGriff, and therefore E. Littlestone and Disch used him to indirectly solicit and take customers and employees from McGriff to Alliant.  (Id., ¶ 30.)  In June 2021, McGriff came into possession of information confirming that its clients were solicited by E. Littlestone and Disch.  Plaintiff alleges that the solicitation is ongoing.  (Id., ¶ 31.)

In November 2009, D. Fields began his employment, and he signed an Employee Agreement on November 2, 2009.  For most of his employment, McGriff was known as BB&T Insurance Services until the name change in 2018.  During his 11-year tenure, D. Fields worked as an insurance agent.  (Id., ¶¶ 32-33.)  On January 10, 2018, the D. Fields Agreement was amended but the confidentiality or non-solicitation provisions remained intact.  (Id., ¶ 34.)  M. Fields began with McGriff, also known as BB&T Insurance Services, in May 2012, at which time he entered into an Employee Agreement.  (Id., ¶¶ 37, 38.)  On January 11, 2018, the Employment Agreement was

amended but not as to confidentiality or non-solicitation provisions. 39.) After departing McGriff, D. Fields and M. Fields began working for Alliant, and in June 2021, McGriff came into information confirming that its clients were solicited by D. Fields and M. Fields. (Id., ¶¶ 43, 46.) In June 2021, McGriff came into possession of information that D. Fields texted an employee to solicit them to leave McGriff and join Alliant, and that D. Fields and M. Fields disclosed their departure to McGriff's customers and clients weeks before informing McGriff to take their business to Alliant. (Id., ¶¶ 47, 48.)

Count I alleges tortious interference with a breached contract against Alliant and Count V alleges tortious interference with an advantageous business relationship against E. Littlestone, C. Littlestone, Disch, D. Fields, M. Fields, and Alliant. Count VI and Count VII allege a breach of fiduciary duty against E. Littlestone (Count VI) and D. Fields (Count VII). Count III alleges a misappropriation of trade secrets in violation of 18 U.S.C. § 1836 and Count IV alleges a misappropriation of trade secrets under Florida law. Count XII seeks a declaratory judgment and Count XIII seeks injunctive relief.

Plaintiff focuses on the breach by defendants subject to restrictive covenants in their Employment Agreements as the basis for the injunction. As relevant to the preliminary injunction, Count II alleges a breach of confidentiality provision in each of

the employment agreements of E. Littlestone, Disch, D. Fields, and M. Fields.  Count VIII alleges a breach of the non-solicitation provision of E. Littlestone, Count IX alleges a breach of the non-solicitation provision of Disch, Count X alleges the breach of the non-solicitation provision of D. Fields, and Count XI alleges the breach of a non-solicitation provision of M. Fields' employment agreement.

### 2. Employment Agreements

As each of the Employment Agreements are different, the Court will identify the relevant clauses as to each applicable defendant. Florida law governs all the Employment Agreements.  (Doc. #17-2, pp. 12, 41, 57, 83.)  Only E. Littlestone, Disch, D. Fields, and M. Fields entered into agreements.

E. Littlestone Employment Agreement

At play are the non-solicitation and confidentiality provisions:

8. Nonsolicitation; Defined Terms.

(a) Nonsolicitation. Employee agrees that, unless specifically authorized by BB&T Insurance in writing, Employee will not, during Employee's employment and for a period of two years following the date of termination of Employee's employment with BB&T Insurance (whatever the reason for the end of the employment relationship), directly or indirectly:

(i) Solicit, recruit, encourage or support any employee of BB&T Insurance who had performed work for BB&T Insurance within the last year

- 6 -

of Employee's employment with BB&T Insurance, to leave the employment of BB&T Insurance;

(ii) Solicit, contact, encourage or support, on Employee's own behalf or on behalf of any business in competition with BB&T Insurance, any provider of insurance products to BB&T Insurance with which Employee has had material contact within the last year of Employee's employment whether with BB&T Insurance or the Agency to discontinue doing or to reduce the amount of business with BB&T Insurance; or

(iii) Solicit, contact, divert, or call upon with the intent of doing business with, any "BB&T Insurance Customer" (as defined below) on Employee's own behalf or on behalf of any Competitive Business (as defined below), if the purpose of the activity is to solicit the BB&T Insurance Customer for a Competitive Business (including but not limited to any Competitive Business started by Employee).

(b) Defined Terms. The following capitalized terms shall have the following meanings:

(i) "Competitive Business" means an enterprise that is in the business

of selling, trading, or servicing business insurance products that are competitive with those offered by BB&T Insurance during the term of Employee's employment with BB&T Insurance.

(ii) "BB&T Insurance Customer" means any company or individual customer of BB&T Insurance or the Agency with whom, within the two-year period ending with the termination of Employee's employment, Employee had material contact or who was otherwise contacted or served by Employee regarding (A) the sale, trade or service or the attempted sale, trade or service of business insurance products or (B) any other business activities of BB&T Insurance or the Agency.

10. BB&T Insurance Information. Employee acknowledges and agrees that all sales files, customer records, customer lists, and reports used, prepared or collected by Employee are the property of BB&T Insurance and agrees that, in the event of the termination of his employment with BB&T Insurance for any reason, he will return and make available to BB&T Insurance prior to the last day of his employment all sales files, customer records, customer lists, reports and all other BB&T Insurance property and materials in his possession.

11. Confidentiality. For and in consideration of the terms of this Agreement, Employee agrees to the following for the protection of BB&T Insurance and its affiliates:

(a) During the term of Employee's employment with BB&T Insurance and for a period of three years following the date of the voluntary or involuntary termination of Employee's employment with BB&T Insurance, for whatever reason, Employee will not, without prior written approval by BB&T Insurance: (i) misappropriate; (ii) use for the purpose of competing with BB&T Insurance, either directly or indirectly; (iii) disclose to any third party, either directly or indirectly; or (iv) aid anyone else in disclosing to any third party, either directly or indirectly, all or any part of any "Confidential Information" (as defined below) to the extent that such Confidential Information does not rise to the level of a trade secret under applicable law.

To the extent that said Confidential Information does rise to the level of a trade secret under applicable law, then, during the term of Employee's employment with BB&T Insurance and thereafter for as long as said Confidential Information remains a trade secret under applicable law (or for the maximum duration provided under such law), Employee will act in accordance with the terms of applicable law governing trade secrets.

(b) "Confidential Information" means: (i) confidential information described in the BB&T Corporation Code of Ethics and BB&T Insurance Code of Conduct as may be amended from time-to-time; (ii) any confidential, proprietary BB&T Insurance information regarding a customer of BB&T Insurance, including but not limited to customer lists, contracts, information, requirements, billing histories, marketing methods, needs and products or services provided by BB&T Insurance to such customers; (iii) all confidential financial information concerning BB&T Insurance or its affiliates, including but not limited to, financial statements, balance sheets, profit and loss statements, earnings, commissions and salaries paid to employees, sales data and projections, cost analyses and similar information; (iv) all confidential sources and methods of supply to BB&T Insurance or its affiliates, including but not limited to contracts and similar information; (v) all confidential plans and projections for business opportunities for new or developing business of BB&T Insurance or its affiliates; and (vi) all confidential information relating to BB&T Insurance's prices, costs, research and development activities, service performance, financial data and operating results, employee lists, personnel matters and other confidential or proprietary information, designs, patents, ideas and trade secrets.

"Confidential Information" shall not, however, include any information or materials to the extent that the same (i) is now in, or later enters, the public domain through no fault of Employee; (ii) was known to Employee prior to the disclosure by BB&T Insurance and such knowledge can be supported by written documentation supplied by Employee; or (iii) was rightfully obtained by Employee after termination of Employee's employment from a third party in rightful possession of such information.

(Doc. #17-2, pp. 7-8, 9.)

        <u>Disch Employment Agreement</u>

        The relevant provisions are very different from the

Littlestone Agreement:

        14. <u>Non-Disclosure of Information Concerning
        Practice and Profession</u>.

        14.1 Employee recognizes and acknowledges that
        Employee will have access to certain
        confidential information of the Employer,
        including Client lists, as well as to
        Employer's Clients or active prospects of the
        Employer and that such information and access
        constitutes valuable, special, and unique
        property of the Employer. Employee will not at
        any time during or after the Employment Term
        (regardless of the reason for termination), in
        any fashion; form or manner, either directly
        or indirectly, utilize, divulge, disclose or
        communicate to any person, firm or corporation
        any information of any kind, nature, or
        description concerning any matters affecting
        or relating to Employer's Business or the
        Employer's Clients including, without
        limitation, the names of any of its Clients or
        active prospects, the names and nature of
        referring businesses and Clients, the fees or
        commissions earned for Employer's services, or
        any other information concerning the
        Employer's Business without regard to whether
        any or all of the foregoing matters otherwise
        would be deemed confidential, material, or
        important. The parties hereby stipulate that,
        as between them, the foregoing matters are
        important, material, and confidential and
        gravely affect the effective and successful
        conduct of the Employer's Business and the
        Employers goodwill and that any breach of the
        terms of this Section is a material breach of
        this Agreement. Employee acknowledges that the
        restrictions contained in this Section are a
        reasonable and necessary protection of the
        legitimate business interests of Employer,

that any violation of these restrictions would cause substantial and irreparable injury to Employer, and that Employer would not have entered into this Agreement with Employee without receiving ·the additional consideration offered by Employee in binding Employee to these restrictions. Employee further acknowledges that irreparable injury would result if Employee were to breach the restrictions of this Section by virtue of the limited number of referral relationships available, which the Employer has developed at great effort and expense and will by virtue of this employment make available to Employee.

In the event of any violation of these restrictions. Employer shall be entitled to preliminary and permanent injunctive relief. As used herein an "active prospect" shall mean any prospective Client who was solicited or marketed by Employee or Employer (or any Affiliate of the Employer) at any time within one (1) year prior to the effective date of Employee's termination of employment under this Agreement, for whatever reason.

14.2 Employee acknowledges that all files, Client records, lists, books, records, literature, products, and other materials owned by Employer or used by it in connection with the conduct of Employer's Business shall at all times remain the property of Employer and that, upon termination of employment hereunder, irrespective of the time, manner or cause of such termination, Employee will surrender to Employer all such files, Client records, lists, books, records, literature, products, and other materials. ·

15. Restrictive Covenants.

15.1 · Employee agrees that Employee will, during the term of this Agreement, render services only for Employer. Employee recognizes and agrees that:

15.1.1 Employee is being employed in a position where Employee will gain specialized knowledge and experience and will establish personal relationships with the Employer's Clients and other employees of Employer; ·

15.1.2 If Employee were to terminate Employee's employment with Employer or if the Employer were to terminate the employment of Employee and Employee then commenced servicing Clients for their insurance needs, either as a sole proprietor, partner, stockholder or employee of another person, partnership or corporation engaged in business competitive with the Employer's Business, the indirect or direct competition of Employee with Employer for the Employers Clients and active prospects would be extremely detrimental and result in irreparable injury to Employer; and

15.1.3 The detriment and irreparable injury to the Employer's Business as a result of competition from Employee for the Employer's Clients will result, in addition to other applicable reasons, because, while working for Employer, Employee will be in a capacity to know and have access to all of the Employer's Client information, Employer's referral patterns, and the Employer's Clients' and active· prospects names and addresses.

15.1.4 Employee acknowledges that discussions with Employer regarding employment have included as a pre-condition the explicit agreement that a restrictive covenant is a reasonable and necessary provision of the employment relationship due to the referral nature of Employer's Business and its valuable relationship patterns with its Clients. Employee also recognizes, acknowledges, and agrees that the value of introductions to Clients and active prospects of Employer as well as the stature and professional standing conferred by virtue of being an employee of Employer is of great value and would not be available to Employee through a means other than this relationship. Employee also

acknowledges and agrees that to compete with Employer for the Employer's Clients would result in irreparable injury to Employer's Business.

15.2 Employee, as an inducement to Employer to employ Employee upon the considerations set forth in this Agreement, hereby promises and agrees that in the event of termination of this Agreement for any reason, or in the event Employee, should leave the employ of Employer for any reason whatsoever, including, but not limited to, Employee's disability, or termination by Employer, with or without cause, it is agreed that Employee shall not within two (2) years of the termination of Employee's employment hereunder, directly or indirectly, for Employee or in connection with another person, firm or corporation, either as an individual, employee, agent, stockholder, partner or otherwise, with or without compensation, solicit, service, market, divert, accept, underwrite or handle any insurance business for the Employer's Clients then carried on the books of Employer or any Affiliate of Employer.

15.3 For a period of two (2) years after the termination of Employee's employment with Employer for any reason, Employee shall not, directly or indirectly, either on Employee's own account or as a partner or joint venturer or as an employee, broker, agent, producer, consultant, or salesperson for any other person, firm of corporation or otherwise, with or without compensation solicit, service, market, divert, accept, underwrite· or handle any insurance business for active prospects of Employer or any Affiliate of Employer.

15.4 For a period of two (2) years after the termination of Employee's employment with Employer for any reason, Employee shall not induce any person employed by Employer or any Affiliate of the Employer to leave employment with the Employer or any Affiliate of Employer.

15.5 If Employee violates this restrictive covenant and Employer brings legal action for injunctive or other relief, Employer shall not, as a result of the time involved in obtaining the relief, be deprived of the benefit of the full period of the restrictive covenant. Accordingly, the restrictive covenant shall be deemed to have the duration specified herein, computed from the date the relief is granted but reduced by the time between the period when the restriction began to run and the date of the first violation of the covenant by Employee.

15.6 If it shall be determined that the duration or any restriction contained in this Section is unenforceable, it is the intention of the parties that the restrictive covenant set forth herein shall be deemed amended to the extent required to render it valid and enforceable to the fullest extent permitted by law, such amendment to apply only with respect to the operation of this Section.

15.7 As an employee of Employer, Employee may, with Employers approval, have access to referral lists, Client lists, Client records, Client files, files of active prospects, trade secrets, and other confidential information of Employer. Moreover, Employee's continued employment will be instrumental to the continuity and development of Employer's Business. Therefore, Employee acknowledges that notwithstanding the fact that this Agreement is terminable at will upon notice, the restrictions contained herein are a reasonable and necessary protection of the legitimate business interests of Employer, that any violation of these restrictions would cause irreparable injury to Employer, and that Employer would not have entered into this Agreement with Employee without receiving the additional consideration offered by Employee in binding Employee to these restrictions. In the event of any violation of these restrictions. Employer shall be entitled to preliminary and permanent injunctive relief,

in addition to any other remedy, including attorney's fees to Employer in any litigation to enforce this Section.

(Doc. #17-2, pp. 37-40.)

### D. Fields Employment Agreement

The Douglas Fields Employment Agreement is more like the Littlestone Agreement with some additional language:

8. Nonsolicitation; Defined Terms.

(a) Nonsolicitation. Employee agrees that, unless specifically authorized by BB&T Insurance in writing, Employee will not, during Employee's employment and for a period of two years following the date of termination of Employee's employment with BB&T Insurance (whatever the reason for the end of the employment relationship), directly or indirectly:

(i) Solicit, recruit, encourage or support any employee of BB&T Insurance who had performed· work for BB&T Insurance within the last year of Employee's employment with BB&T Insurance to leave the employment of BB&T Insurance;

(ii) Solicit, contact, encourage or support, on Employee's own behalf or on behalf of any business in competition with BB&T Insurance, any provider of insurance products to BB&T Insurance with which Employee has had material contact within the last year of Employee's employment whether with BB&T Insurance or the Agency to discontinue doing or to reduce the amount of business with BB&T Insurance; or

(iii) Solicit, contact, divert, or call upon with the intent of doing business with, any "BB&T Insurance Customer" (as defined below) on Employee's own behalf or on behalf of any Competitive Business (as defined below), if the purpose of the activity is to solicit the BB&T Insurance Customer for a Competitive

Business (including but not limited to any Competitive Business started by Employee).

(b) <u>Defined Terms</u>. The following capitalized terms shall have the following meanings:

(i) "Competitive Activity" means the sale, trade or service or attempted sale, trade or service of business insurance products, which services and activities Employee acknowledges are identical or substantially similar to those services and activities performed by Employee on behalf of BB&T Insurance.

(ii) "Competitive Business" means an enterprise that is in the business of selling, trading, or servicing business insurance products that are competitive with those offered by BB&T Insurance during the term of Employee's employment with BB&T Insurance.

(iii) "BB&T Insurance Customer" means any company or individual customer of BB&T Insurance or the Agency with whom, within the two-year period ending with the termination of Employee's employment, Employee had material contact or who was otherwise contacted or served by Employee regarding (A) the sale, trade or service or the attempted sale, trade or service of business insurance products or (B) any other business activities of BB&T Insurance or the Agency.

(iv) "Restricted Territory" means **[counties[3] in which Employee worked and wrote business,]** County, FL. and all contiguous counties thereto. Employee acknowledges that the Restricted Territory encompasses that area in which BB&T Insurance-Oswald Trippe and Company, the Agency and Employee operated BB&T Insurance-Oswald Trippe and Company's and the Agency's business and provided services.

9. <u>Noncompetition</u>. In connection with the employment of Employee by BB&T Insurance, the

---

[3] Broward is hand-written above this line.

payment of compensation to Employee, the Term
and any Renewal Period of this Agreement, the
Separation Compensation, and the acquisition
of the Agency's business by BB&T Insurance,
Employee agrees that, unless specifically
authorized by BB&T Insurance in writing,
Employee will not, for a period of two years
following the date of termination of
Employee's employment with BB&T Insurance
(whatever the reason for the end of the
employment relationship), directly or
indirectly, engage in any "Competitive
Activity" (as defined above) within the
"Restricted Territory" (as defined above) in
a capacity identical or similar to that in
which Employee worked for BB&T Insurance,
provided, however, that the provisions of the
Section 9 shall terminate and cease to be of
any effect on November 1, 2014.

    . . . .

12. Confidentiality. For and in consideration
of the terms of this Agreement, Employee
agrees to the following for the protection of
BB&T Insurance and its affiliates:

(a) During the term of Employee's employment
with BB&T Insurance and for a period of three
years following the date of the voluntary or
involuntary termination of Employee's
employment with BB&T Insurance, for whatever
reason, Employee will not, without prior
written approval by BB&T Insurance: (i)
misappropriate; (ii) use for the purpose of
competing with BB&T Insurance, either directly
or indirectly; (iii) disclose to any third
party, either directly or indirectly; or (iv)
aid anyone else in disclosing to any third
party, either directly or indirectly, all or
any part of any "Confidential Information" (as
defined below) to the extent that such
Confidential Information does not rise to the
level of a trade secret under applicable law.

To the extent that said Confidential
Information does rise to the level of a trade

- 17 -

secret under applicable law, then, during the term of Employee's employment with BB&T Insurance and thereafter for as long as said Confidential Information remains a trade secret under applicable law (or for the maximum duration provided under such law), Employee will act in accordance with the terms of applicable law governing trade secrets.

(b) "Confidential Information" means: (i) confidential information described in the BB&T Corporation Code of Ethics and BB&T Insurance Code of Conduct as may be amended from time-to-time; (ii) any confidential, proprietary BB&T Insurance information regarding a customer of BB&T Insurance, including but not limited to customer lists, contracts, information, requirements, billing histories, marketing methods, needs and products or services provided by BB&T Insurance to such customers; (iii) all confidential financial information concerning BB&T Insurance or its affiliates, including but not limited to, financial statements, balance sheets, profit and loss statements, earnings, commissions and salaries paid to employees, sales data and projections, cost analyses and similar information; (iv) all confidential sources and methods of supply to BB&T Insurance or its affiliates, including but not limited to contracts and similar information; (v) all confidential plans and projections for business opportunities for new or developing business of BB&T Insurance or its affiliates; and (vi) all confidential information relating to BB&T Insurance's prices, costs, research and development activities, service performance, financial data and operating results, employee lists, personnel matters and other confidential or proprietary information, designs, patents, ideas and trade secrets.

"Confidential Information" shall not, however, include any information or materials to the extent that the same (i) is now in, or later enters, the public domain through no

> fault of Employee; (ii) was known to Employee prior to the disclosure by BB&T Insurance and such knowledge can be supported by written documentation supplied by Employee; or (iii) was rightfully obtained by Employee after termination of Employee's employment from a third party in rightful possession of such information.

(Doc. #17-2, pp. 52-53, 54-55.)

### M. Fields Employment Agreement

Again, the terms are very similar to the Agreements for D. Fields and Littestone, but not identical.

> 8. Nonsolicitation; Defined Terms.
>
> (a) Nonsolicitation. Employee agrees that, unless specifically authorized by BB&T Insurance in writing, Employee will not, during Employee's employment and for a period of two years following the date of termination of Employee's employment with BB&T Insurance (whatever the reason for the end of the employment relationship), directly or indirectly:
>
> (i) Solicit, recruit, encourage or support any employee of BB&T Insurance who had performed work for BB&T Insurance within the last year of Employee's employment with BB&T Insurance to leave the employment of BB&T Insurance;
>
> (ii) Solicit, contact, encourage or support, on Employee's own behalf or on behalf of any business in competition with BB&T Insurance, any provider of insurance products to BB&T Insurance with which Employee has had material contact within the last year of Employee's employment with BB&T Insurance to discontinue doing or to reduce the amount of business with BB&T Insurance;
>
> (iii) Solicit, contact, divert, or call upon with the intent of doing business with, any

"BB&T Insurance Customer" (as defined below) on Employee's own behalf or on behalf of any Competitive Business (as defined below), if the purpose of the activity is to solicit the BB&T Insurance Customer for a Competitive Business (including but not limited to any Competitive Business started by Employee); or

(iv) Accept, on Employee's own behalf or on behalf of any "Competitive Business" (as defined below), an offer/opportunity from any "BB&T Insurance Customer" (as defined below) to sell, trade or service business insurance products that are competitive with those offered by BB&T Insurance during the term of Employee's employment with BB&T Insurance.

(b) Defined Terms. The following capitalized terms shall have the following meanings:

(i) "Competitive Business" means an enterprise that is in the business of selling, trading, or servicing business insurance products that are competitive with those offered by BB&T Insurance during the term of Employee's employment with BB&T Insurance.

(ii) "BB&T Insurance Customer" means any company or individual customer of BB&T Insurance with whom, within the two-year period ending with the termination of Employee's employment, Employee had material contact or who was otherwise contacted or served by Employee regarding (A) the sale, trade or service or the attempted sale, trade or service of business insurance products or (B) any other business activities of BB&T Insurance.

9. Employee Acknowledgments.

(a) Employee agrees that during the term of his employment with BB&T Insurance, Employee will not engage in the sale, trade or servicing or attempted sale, trade or servicing of business insurance individually

or with any company or individual other than BB&T Insurance.

(b)   Employee   acknowledges   that   the restrictions placed upon Employee by Sections 8 and 9 (a) of this Agreement are reasonable given the nature of Employee's position with BB&T Insurance, the area in which BB&T Insurance markets its products and services, and   the   consideration   provided   by   BB&T Insurance to Employee. Specifically, Employee acknowledges   that   the   length   of   the restrictive   covenants   given   above   is reasonable and that the definitions of "BB&T Insurance   Customer,"   and   "Competitive Business"   are   reasonable.   Employee acknowledges that these restrictions will not cause an unfair burden on Employee.

(c)   Employee acknowledges that all of the provisions of Sections 8, 9 (a), and 11 of this Agreement are fair and necessary to protect the interests of BB&T Insurance and to prevent   Employee   from   unfairly   taking advantage   of   contacts   established   during employment. Accordingly, Employee agrees not to contest the validity or enforceability of such sections of this Agreement and agrees that if any court should hold any provision of such   sections   or   this   Agreement   to   be unenforceable, the remaining provisions will be enforceable. Further, if any provision or subsection   is   held   to   be   over   broad   as written, Employee agrees that a court should modify said provision or subsection in order to make it enforceable and view the above provisions and subsections as separable and uphold   those   separable   provisions   and subsections deemed to be reasonable. Sections 8 and 11 shall survive the termination of this Agreement.

10.   BB&T   Insurance   Information.   Employee acknowledges and agrees that all sales files, customer records, customer lists, and reports used, prepared or collected by Employee are the   property   of   BB&T   Insurance   and   agrees

that, in the event of the termination of his employment with BB&T Insurance for any reason, he will return and make available to BB&T Insurance prior to the last day of his employment all sales files, customer records, customer lists, reports and all other BB&T Insurance property and materials in his possession.

11. Confidentiality. For and in consideration of the terms of this Agreement, Employee agrees to the following for the protection of BB&T Insurance and its affiliates:

(a) During the term of Employee's employment with BB&T Insurance and for a period of three years following the date of the voluntary or involuntary termination of Employee's employment with BB&T Insurance, for whatever reason, Employee will not, without prior written approval by BB&T Insurance: (i) misappropriate; (ii) use for the purpose of competing with BB&T Insurance, either directly or indirectly; (iii) disclose to any third party, either directly or indirectly; or (iv) aid anyone else in disclosing to any third party, either directly or indirectly, all or any part of any "Confidential Information" (as defined below) to the extent that such Confidential Information does not rise to the level of a trade secret under applicable law.

To the extent that said Confidential Information does rise to the level of a trade secret under applicable law, then, during the term of Employee's employment with BB&T Insurance and thereafter for as long as said Confidential Information remains a trade secret under applicable law (or for the maximum duration provided under such law), Employee will act in accordance with the terms of applicable law governing trade secrets.

(b) "Confidential Information" means: (i) confidential information described in the BB&T Corporation Code of Ethics and BB&T Insurance Code of Conduct as may be amended from time-

to-time; (ii) any confidential, proprietary BB&T Insurance information regarding a customer of BB&T Insurance, including but not limited to customer lists, contracts, information, requirements, billing histories, marketing methods, needs and products or services provided by BB&T Insurance to such customers; (iii) all confidential financial information concerning BB&T Insurance or its affiliates, including but not limited to, financial statements, balance sheets, profit and loss statements, earnings, commissions and salaries paid to employees, sales data and projections, cost analyses and similar information; (iv) all confidential sources and methods of supply to BB&T Insurance or its affiliates, including but not limited to contracts and similar information; (v) all confidential plans and projections for business opportunities for new or developing business of BB&T Insurance or its affiliates, including information pertaining to potential customers or prospects; and (vi) all confidential information relating to BB&T Insurance's prices, costs, research and development activities, service performance, financial data and operating results, employee lists, personnel matters and other confidential or proprietary information, designs, patents, ideas and trade secrets.

"Confidential Information" shall not, however, include any information or materials to the extent that the same (i) is now in, or later enters, the public domain through no fault of Employee; (ii) was known to Employee prior to the disclosure by BB&T Insurance and such knowledge can be supported by written documentation supplied by Employee; or (iii) was rightfully obtained by Employee after termination of Employee's employment from a third party in rightful possession of such information.

(Doc. #17-2, pp. 78-80.)

### 3. Breach

"For a breach of contract claim, Florida law requires the plaintiff to plead and establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1272 (11th Cir. 2009).  To enforce restrictive covenants, plaintiff must demonstrate that the restrictive covenants are enforceable, and defeat each affirmative defense.  Lucky Cousins Trucking, Inc. v. QC Energy Res. Texas, LLC, 223 F. Supp. 3d 1221, 1225 (M.D. Fla. 2016) (citations omitted).  "[E]nforcement of contracts that restrict or prohibit competition during or after the term of restrictive covenants, so long as such contracts are reasonable in time, area, and line of business, is not prohibited."  Fla. Stat. § 542.335(1).  "A violation of an enforceable restrictive covenant creates a presumption of irreparable injury."  Env't Servs., Inc. v. Carter, 9 So. 3d 1258, 1262 (Fla. 5th DCA 2009) (citation omitted).

### 4. Plaintiff's Declarations

In support of the request for an injunction, Gray G. Davis, Senior Vice President at McGriff since November 2009, filed a Declaration (Doc. #17-1) stating that on June 1, 2021 and June 14, 2021, several top insurance agents voluntarily resigned from McGriff with no prior notice and joined Alliant, a direct competitor.  The employees who left on June 1, 2021, are E.

Littlestone, C. Littlestone, and Disch, and D. Fields, and his son M. Fields left on June 14, 2021.  When E. Littlestone resigned, Gray Davis called him and during the call "he shared with [Davis] that he had been in negotiations with Alliant for 8 months and made his decision to leave McGriff 6 months prior to his resignation."  (Id., ¶ 3.)  Since their resignations, the 4 employees with Agreements containing restrictive covenants have recruited 16 other employees who resigned without notice for employment at Alliant.  (Id., ¶ 20.)  Also, as of the date of the Declaration, 130 clients of McGriff who were serviced by Littlestone, Disch, D. Fields and/or M. Fields have signed Agent of Record letters indicating that they have agreed to have Alliant serve as their insurance broker.  Mr. Davis infers solicitation because of the compressed time period and states that McGriff continue to receive more letters.  (Id., ¶ 21.)

The Declaration of Jackie Diaz, a current Account Executive at McGriff since 2016, states that D. Fields was trying to recruit her even before he resigned and that he had "already negotiated [her] salary and bonus with Alliant."  (Doc. #17-3, ¶ 3.)  D. Fields kept up the calls and Diaz stopped answering his calls. (Id.)  The week of June 14, 2021, when D. Fields resigned, Diaz received a card, flowers, and some computer equipment from Alliant, and thereafter a call about onboarding.  (Id., ¶ 4.)

- 25 -

The Declaration of Kelly Matacena, a Business Insurance Agent at McGriff since 2017 was assigned some of M. Fields' former clients. One of the clients is a luxury vacation resort who stated that the company had signed a letter sent to them from M. Fields indicating they wanted Alliant to serve as the new insurance broker. The client was under the impression that it was another name change. Matacena clarified that it was not, and that M. Fields had joined another company. (Doc. #17-4, ¶ 3.) The client rescinded the letter to stay with McGriff. (Id., ¶ 4.)

The Declaration of Bill Fairnington III, a Family Risk Manager and Assistant Vice President at McGriff since November 2009, provides that he was assigned some of D. Fields' former clients. One of the clients is an individual. On June 26, 2021, the client forwarded an email to D. Fields at his old McGriff email address asking, "What's this?" about a Broker of Record form and DocuSign request that he received from Alliant. (Doc. #17-5, ¶ 3.) Fairnington had access to the email account and reached out to the client. The client stated that he had no plans to leave McGriff and he was directed to delete the email. (Id., ¶ 4.) Since his resignation, D. Fields has called several times telling Fairnington that he is going to take all his former clients "and will stop at nothing to take them back." (Id., ¶ 5.)

The Declaration of Eric Woodling, a Regional Sales Director at McGriff since June 2020, provides that he drove from the Coral

Gables office to meet with E. Littlestone and C. Littlestone in the Fort Myers office on June 1, 2021, the date they resigned. E. Littlestone was reminded about the terms of his Employment Agreement, and he responded that it was not his intention to violate the terms. (Doc. #17-7, ¶ 3.) Within a few days, several Account Managers and Client Service Agents that supported E. Littlestone resigned, and by the end of the following week, his entire team led by Disch all resigned. (Id., ¶ 4.) Two weeks alter D. Fields and M. Fields resigned and several of their support staff resigned to work for Alliant. (Id., ¶ 5.) While monitoring the E. Littlestone McGriff email account, Woodling learned that both Littlestones were soliciting McGriff clients. It is inferred that E. Littlestone and Disch were indirectly soliciting and taking customers and employees through C. Littlestone who does not have an employment agreement. (Id., ¶ 7.) According to McGriff's agents who were assigned clients of D. Fields, D. Fields was calling McGriff's clients up to two weeks before he resigned to let them know he was leaving to join Alliant. (Id., ¶ 9.)

**5. Defendant's Declarations**

A Declaration is provided from E. Littlestone stating that he did not recruit, solicit, or encourage any members of his former team at McGriff to join Alliant. (Doc. #27-1, ¶ 5.) E. Littlestone also denied taking any of the identified confidential information. E. Littlestone does have the telephone numbers of

certain customer representatives considered to be close friends on his personal phone.  (Id., ¶ 6.)  E. Littlestone denies that he told Mr. Davis that he decided to joint Alliant 6 months before his resignation, and further that it is not untrue.  (Id., ¶ 7.) Since leaving McGriff, multiple property managers and association board members he worked with reached out to him asking how to continue working with him without initial contact from him.  (Id., ¶ 9.) The property managers and association board members have expressed concerns regarding McGriff's ability to handle their clients' insurance coverage needs.  E. Littlestone states that he receives as many as 5 calls each day from McGriff clients who used to work with him because the clients can't get McGriff to return their calls or emails or send them their certificates of insurance. (Id., ¶ 10.)

In his Declaration, D. Fields states that he did not retain any documents or information from McGriff, including confidential documents or information.  (Doc. #27-2, ¶ 10.)  On June 22, 2021, a former customer reached out to D. Fields regarding a premium payment that was set to be withdrawn from his account.  D. Fields forwarded the email to a current McGriff employee so she could service the account.  Despite this attempt to assist, McGriff's attorney demanded that he refrain from contacting its employees. (Id., ¶ 11.)  On July 13, 2021, D. Fields received another email from a client informing him that Fairnington III called him to

state D. Fields was subject to a non-compete agreement.  (Id., ¶ 12.)  D. Fields denies telling Fairnington that he would take all his clients back.  (Id., ¶ 15.)  D. Fields denies that he ever told Diaz that he had negotiated a salary on her behalf with Alliant, or that he had been recruiting her.  (Id., ¶¶ 19-20.)

The Declaration of Catherine Pipitone, the Senior Vice President and Senior Manager of Operations for Alliant discusses a June 16, 2021 email from Alliant Recruitment Team Lead Pam Tabert informing her that Diaz had applied for a position.  (Doc. #27-3, ¶ 4.)  The next day, Diaz returned an executed offer letter agreeing to start on June 21, 2021, so "as is customary with new hires for Alliant", Diaz was sent a welcome package including a laptop, docking station, 2 monitors, a keyboard and mouse, and an iPhone.  (Id., ¶¶ 6-7.)  After accepting a position, Diaz stopped communicating with Alliant and returned all the onboarding equipment Alliant had sent and it became "apparent" she would not be joining Alliant.  (Id., ¶ 8.)  Pipitone states that D. Fields had no role in negotiating Diaz's salary and benefits.  (Id., ¶ 10.)

The Declaration of M. Fields responds to the Declaration of Kelly Matacena, a McGriff insurance agent.  (Doc. #27-4, ¶ 4.)  M. Fields states that the former luxury vacation resort customer contacted him about work he was doing, and when M. Fields stated he was no longer working for McGriff, it was the client who asked

if they could continue doing business.  (Id., ¶ 5.)  M. Fields told the customer he could not solicit his business, and the customer understood that he now worked for a different company. The customer ended up staying with McGriff.  (Id., ¶¶ 6-7.)  M. Fields provided a copy of the Matacena Declaration to a customer representative who stated it was not accurate.  (Id., ¶¶ 9-10.)

The Declaration of Robert Soriana, the President of the Board for a condominium association in Punta Gorda, Florida, is written as a longtime friend and client of E. Littlestone.  (Doc. #27-5, ¶ 3.)  Soriana learned that E. Littlestone was no longer employed by McGriff so he called E. Littlestone who informed him that he was subject to a non-solicitation agreement and could not solicit Soriana's business.  Soriana made it clear that he trusted E. Littlestone and wished to continue with him regardless of the employer.  (Id., ¶¶ 5-6.)  Soriana disputes the statements by Woodling and denies sending the emails in response to a solicitation but that he sent them so that he could continue with the Littlestones.  (Id., ¶ 7.)

The Declaration of Donald Roedding is also on behalf of E. Littlestone as he has worked with him for over 20 years.  (Doc. #27-6, ¶ 4.)  Roedding handles insurance needs for the associations he manages as the association manager for a management company that provides services to over 215 condominium and homeowners associations.  (Id., ¶ 2.)  After an employee of

McGriff emailed Roedding to inform him that E. Littlestone had left the company, Roedding called E. Littlestone directly to ask what happened.  E. Littlestone informed Roedding that he had left McGriff and was bound by a non-solicitation agreement and could not solicit business.  (Id., ¶ 5.)  Roedding states that E. Littlestone did not ask him to solicit business on his behalf, or on behalf of Alliant, for any of the associations he worked with on behalf of McGriff.  (Id., ¶ 6.)  When Roedding would meet boards with policies up for renewal, "without any direction or encouragement from Mr. Littlestone," he advised them they could continue with McGriff or start doing business with Alliant where the Littlestones now work.  Each board chose Alliant, and when they did so Roedding provided the contact information.  (Id., ¶ 8.)  Roedding is not aware of E. Littlestone asking any of the associations to stop doing business with McGriff.  (Id., ¶ 9.)

Several short and nearly identical Declarations are attached from Kayla Caride, Kristin Coke, Isabel Cuadrado, Myra Irizarry, Kate Gilbert, Alisa Josephs, Lesvia Paz, Rebecca Rodriguez, Jodee Ransom, Wanda Webb, Deaven Hogue, and Bianca Palomo who all left employment with McGriff to work for Alliant.  Declarants state that neither E. Littlestone, nor D. Fields, nor M. Fields recruited or solicited them to join Alliant and that the decision was made on their own.  (Docs. #27-7-#27-18, ¶ 3.)  Ransom also denies that C. Littlestone recruited or solicited her.  (Doc. #27-15, ¶ 3.)

**6. Plaintiff's Reply Declarations**

In reply, plaintiff filed Second Declarations to respond to defendants' declarations.  The Second Declaration of Jackie Diaz responds to the Declaration of D. Fields and denies his denials as false.  Diaz includes screen shots of calls made reflecting calls received after D. Fields resigned.  Diaz felt pressure to leave too and followed D. Fields to Alliant.  Diaz, in response to the Declaration of Pipitone, states that she did complete an application but realized her mistake and decided to stay at McGriff and resign.  (Doc. #37-1.)

The Second Declaration of Gray G. Davis states that defendants' position that they did not proactively reach out or solicit any McGriff clients is false.  Davis states that there have been at least 8 clients that have been signed letters to switch to Alliant, but they later rescinded.  Davis infers that for the clients to have signed the letter, it would have been received from Alliant and "[t]his necessarily means that Alliant had the contact information for these clients, which they obtained from the Fields or Littlestones."  (Doc. #37-3.)

The Declaration of Scott Gregory, an Agent and the Vice President of McGriff, states that he received an email that attached a voicemail received from Ransom at Alliant for a renewal that stated "I'm not sure if you have been in contact with Mr. Littlestone as of yet, but I was just calling to collect some

information so we could quote up a proposal for you. . . ."  An email address at Alliant was provided.  (Doc. #37-4.)

### 7. Defendant's Surreply Declarations

Not to be outdone, defendants filed a Second Declaration of Douglas Fields in response to the second declaration of Diaz regarding the calls made in the last few months before he left. D. Fields states that the calls were in the ordinary course of business on behalf of McGriff because most McGriff employees were working from home and exclusively using cell phones.  After his resignation, D. Fields learned that Diaz applied to Alliant and that she would be assigned to his team.  D. Fields called several times to discuss her starting work at Alliant, but he did not solicit or recruit Diaz in any of the phone calls.  D. Fields learned on July 20, 2021, that McGriff is still using his name and likeness to market products after his resignation.  (Doc. #40-1.)

The Second Declaration of Jodee Ransom responds that she has no agreement with McGriff that would prevent her from competing against or soliciting from McGriff.  Ransom states that she did not take any confidential information when she left.  In response to the declaration of Gregory, Ransom states that she starts working on insurance renewals for condominium associations approximately 90 days prior to renewal being due, and she recalled the association was due from experience.  "Without any direction

from or involvement of Eugene Littlestone," Ransom looked up the public information for the client to contact them.  (Doc. #40-2.)

The Second Declaration of Eugene Littlestone states that may property managers contact him about continuing coverage, but that he did not solicit the customers.  E. Littlestone states that McGriff is interfering by refusing to release clients contrary to their wishes.  "Only after the property manager threatened to report McGriff to the Office of Insurance Regulation did McGriff finally release the association to change its broker of record to Alliant prior to the renewal."  E. Littlestone notes that the 8 customers who executed broker of record letters have not been identified by McGriff but that some stayed with McGriff due to the timing of a renewal deadline.  (Doc. #40-3.)

## 8. Conclusion

"[W]here material facts are not in dispute, or where facts in dispute are not material to the preliminary injunction sought, district courts generally need not hold an evidentiary hearing." McDonald's Corp. v. Robertson, 147 F.3d 1301, 1313 (11th Cir. 1998).

> "[W]here facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue," district courts must hold an evidentiary hearing on the propriety of injunctive relief.  McDonald's Corp. v. Robertson, 147 F.3d 1301, 1312 (11th Cir. 1998) (citing All Care Nursing Serv. , Inc. v. Bethesda Mem'l Hosp., Inc., 887 F.2d 1535,

> 1538 (11th Cir. 1989)] (further citation
> omitted). At that hearing, the Court sits as
> both factfinder and assessor of credibility.
> See Four Seasons Hotels and Resorts, B.V. v.
> Consorcio Barr, S.A., 320 F.3d 1205, 1211
> (11th Cir. 2003).

Fla. Atl. Univ. Bd. of Trustees v. Parsont, 465 F. Supp. 3d 1279, 1288-89 (S.D. Fla. 2020). The Court finds that while this is a case of 'bitterly contested' facts, an evidentiary hearing is not required because substantial likelihood of success has not been shown.

For example, D. Fields forwarded an email from a former client to a current McGriff employee so she could service the account. Further, Kayla Caride, Kristin Coke, Isabel Cuadrado, Myra Irizarry, Kate Gilbert, Alisa Josephs, Lesvia Paz, Rebecca Rodriguez, Jodee Ransom, Wanda Webb, Deaven Hogue, and Bianca Palomo all filed declarations stating that they left McGriff for employment at Alliant without solicitation. Robert Soriana, the President of the Board for a condominium association in Punta Gorda, Florida, called E. Littlestone who informed him that he was subject to a non-solicitation agreement and could not solicit Soriana's business. The fact that Soriana actively chose to proceed with Alliant cannot be attributed to E. Littlestone as solicitation. Donald Roedding, an association manager for a management company that provides services to over 215 condominium and homeowners associations, called E. Littlestone directly to ask

what happened and E. Littlestone informed Roedding that he had left McGriff and was bound by a non-solicitation agreement and could not solicit business.  Roedding actively encouraged the associations under his management on his own and without solicitation for them to consider staying with E. Littlestone at Alliant.

The Court finds that plaintiff has failed to meet the extraordinary burden to show that defendants, subject to an employment agreement, likely solicited former clients or that they took client information when they resigned.

**B. Irreparable Injury**

"Injunctive relief is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief," and not just the possibility of irreparable harm. Winter v. NRDC, Inc., 555 U.S. 7, 22 (2008) (citing Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam)).  "[T]he asserted irreparable injury must be neither remote nor speculative, but actual and imminent." Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (citations omitted).

One of the reasons why injunctions are a favored remedy for breaches of restrictive covenants is that it is "inherently difficult" to determine "what damage actually is caused by the employee's breach of [of a restrictive covenant]." Proudfoot Consulting Co. v. Gordon, 576 F.3d 1223, 1243 (11th Cir. 2009)

(quoting Capraro v. Lanier Bus. Prods., Inc., 466 So. 2d 212, 213
(Fla. 1985) (citation omitted)).  The Court finds that plaintiff
have failed to clearly show even the possibility of irreparable
injury attributable to defendants.  Many of the customers clearly
went of their own volition or at the solicitation of Donald
Roedding, but not by the conduct of those subject to a restrictive
covenant.

   **C. Balancing Harm to Other Litigant**

   The balancing of harms, based on the facts provided, favors
denial of injunctive relief.  Plaintiff infers solicitation by
defendants based on the timeline of departures, but no declarations
have been provided of any clients who were unquestionably contacted
and solicited.

   **D. Public Interest**

   While the Court has an interest in enforcing non-solicitation
and confidentiality agreements, the Court also finds a public
interest in the right of employees to seek employment elsewhere
when unhappy with the conditions of employment as expressed by
defendants.

   Accordingly, it is hereby

   **ORDERED**:

   Plaintiff's Motion for Temporary Restraining Order (Doc.

#17), construed as a motion for preliminary injunction, is

**DENIED.**

**DONE and ORDERED** at Fort Myers, Florida, this ___21st___ day

of September 2021.

_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Counsel of Record